# UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

FERNANDO CATALAN-AGUILAR

        Plaintiff,

    v.

R3 EDUCATION, INC. dba MEDICAL
UNIVERSITY OF THE AMERICAS,

        Defendant.

Civil Action No. 1:14-cv-12607-GAO

## R3 EDUCATION, INC.'S MEMORANDUM IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Fernando Catalan-Aguilar was a student in the medical doctor (M.D.) program at the Medical University of the Americas ("MUA"), which is operated by the defendant R3 Education, Inc. ("R3").  Beginning in 2010, MUA required all M.D. students to pass two qualifying examinations within twelve months of completing their clinical rotations in order to graduate.  Passing the examinations demonstrates a student's mastery of clinical knowledge and clinical skills and thus his readiness to enter residency.  Plaintiff attempted the second test once within twelve months of completing his clinical rotations but failed by a wide margin.  Although MUA could have dismissed Plaintiff at the end of that twelve-month period, MUA gave him extra time to demonstrate that he was ready to re-take the exam.  Plaintiff, however, consistently failed to demonstrate any progress.  As a result, MUA declined to certify Plaintiff to re-take the examination and ultimately dismissed him from the M.D. program.

Plaintiff contends that MUA acted improperly in dismissing him, thereby breaching its contract with him and breaching the covenant of good faith and fair dealing implied in that contract.  Specifically, Plaintiff argues that (1) MUA's policy requiring students to pass the qualifying examinations within twelve months of completing clinical rotations is not binding

because it was not a "written policy"; (2) MUA in any event "waived" the requirement in his case by agreeing to a study plan that allowed him extra time to re-take the second examination; and (3) MUA acted arbitrarily and capriciously in not certifying him to re-take the examination after he submitted two practice test scores which (he now claims) demonstrated his readiness to re-take the exam.

The material facts are not disputed and MUA is entitled to judgment in its favor as a matter of law.  MUA did publish the examination policy "in writing," and Plaintiff admittedly was aware of the policy long before he was dismissed for failing to meet its requirements.  The fact that MUA gave Plaintiff additional time to pass the exam, and engaged with him on a "study plan" to help him meet that goal, did not operate to "waive" the examination requirement.  Nor did MUA act arbitrarily or capriciously in refusing to certify Plaintiff to re-take the examination at issue:  He had failed his first attempt by a wide margin; he also failed by a wide margin all five of the legitimate practice examinations he took thereafter; and the two practice examination scores he submitted on the eve of his dismissal were irrelevant – they were not legitimate practice examinations and MUA had good reason to doubt his scores on them in any event, as Plaintiff admitted at the time.  Where, as here, a university's academic decision is not arbitrary and capricious, it is entitled to deference by the Court and should not be disturbed.

STATEMENT OF UNDISPUTED FACTS

### A.    MUA's Program Requirements

Plaintiff entered the M.D. program at MUA in May 2006.  Plaintiff's Response to Defendant's Requests for Admission ("Pl.'s Adm.") (attached as Ex. A) No. 1.

Students in the program first complete a two-year curriculum in the basic sciences.  Pl. Dep. (attached as Ex. B) at 18, 20.  In order to progress to the clinical portion of the program,

students then must pass Step 1 of the United States Medical Licensing Examination ("USMLE"), a multi-part examination administered by the National Board of Licensing Examiners ("NBME"). Pl.'s Adm. (Ex. A) Nos. 4 & 5; Pl. Dep. (Ex. B) at 34. Passing the USMLE in its entirety is required in order to obtain licensure to practice medicine in the United States. Pl. Dep. (Ex. B) at 34.

MUA requires students to pass Step 1 of the USMLE within three attempts and within fifteen months after completing their basic sciences curriculum. Guidelines for Academic Probation and Dismissal (attached as Ex. C); Pl. Dep. (Ex. B) at 20. If a student does so, the student then goes on to the clinical portion of the M.D. program, in which the student completes seventy-two weeks of clinical rotations at hospitals in the United States or Canada. Pl.'s Adm. (Ex. A) No. 30; Pl. Dep. (Ex. B) at 23.

In order to graduate from MUA and go on to residency, a student must pass both parts of the USMLE Step 2 examinations – Step 2 Clinical Knowledge ("CK") and Step 2 Clinical Skills ("CS"). Memo. to all MUA Students (Pl. Dep. Ex. 9) (attached as Ex. D); Dear Clinical Student Letter (Pl. Dep. Ex. 12) (attached as Ex. E); Oct. 24, 2011 Email (Pl. Dep. Ex. 17) (attached as Ex. F) at 2; Pl.'s Adm. (Ex. A) Nos. 4, 5; Pl. Dep. (Ex. B) at 34. Beginning in 2010, MUA adopted a requirement that students pass both Step 2 examinations within three attempts and within twelve months after completing their clinical rotations. Pl. Dep. (Ex. B) at 95-96; Memo. to all Students (Ex. D); Oct. 24, 2011 Email (Pl. Dep. Ex. 17) (Ex. F) at 2. Students who do not meet this requirement are subject to dismissal. Memo. to all Students (Ex. D).

Before students may take either part of the Step 2 examination, they must be approved to sit for the exam by MUA's Clinical Dean. Dear Clinical Student Letter (Ex. E). The purpose of this requirement is to protect the student's ability to obtain a residency following graduation

from medical school.  Tilleman Dep. (Ex. K) at 37-38.  Students with multiple failures of any

USMLE exam find it difficult if not impossible to obtain a residency.  Pl. Dep. (Ex. B) at 101-02.

Accordingly, MUA allows students to sit for the exam only when they have demonstrated that

they have acquired the knowledge needed to pass it.  Tilleman Dep. (Ex. K) at 37-38.

### B.     Plaintiff was Fully Aware of the USMLE Exam Requirements

MUA notified all students about the USMLE examination requirements in 2010.  Memo.

to all Students (Ex. D); Green Dep. (attached as Ex. G) at 11-12.  It was MUA's practice to

notify students of a new policy by email and by posting the policy on the website that students

regularly access in connection with school-related matters.  Pl. Dep. (Ex. B) at 41-42.  Plaintiff

admits that he accessed the MUA website from time to time.  *Id.* at 41.  Moreover, MUA's

Student Handbook alerted students that the policies were "subject to change without prior

notice."  Summer 2009 MUA Handbook, Disclaimer Page (attached as Ex. H).  The Handbook

also states that students were required to "remain aware and informed of the [academic]

guidelines by reading notices and meeting with their adviser."  Summer 2009 MUA Handbook

Academic Guidelines (attached as Ex. I).

Although Plaintiff now denies becoming aware of the policy when it was announced in

2010, Pl.'s Adm. (Ex. A) Nos. 32-35; Pl. Dep. (Ex. B) at 43, Plaintiff admits he was aware of the

requirement to pass Steps 1 and 2 of the USMLE by at least February 28, 2011, when he

received an email to that effect from one of MUA's Clinical Medicine staff.  Pl.'s Adm. (Ex. A)

No. 36.  Plaintiff further admits that he knew he needed to pass both Step 2 exams within twelve

months of completing his clinical rotations by at least October 24, 2011, when he received an

email to that effect from one of the MUA deans.  *Id.* Nos. 47, 48; Pl. Dep. (Ex. B) at 96.

Tellingly, in his responses to both emails, Plaintiff does not say or suggest that he was hearing

about these policies for the first time.  Pl. Dep. (Ex. B) at 47-48, 95-96; Feb. 28, 2011 Email (Pl.

Dep. Ex. 10) (attached as Ex. J), Oct. 24, 2011 Email (Ex. F); Pl.'s Adm. (Ex. A) No. 39.

Plaintiff also was aware at all relevant times that he needed approval from the MUA

Clinical Dean before sitting for either of the Step 2 exams.  Pl. Dep. (Ex. B) at 54, 57, 61-62.

### C. Plaintiff Struggles with the USMLE Exam Requirements from the Outset, But Ultimately Passes Step 1 and Step 2 CS

Plaintiff completed his basic sciences curriculum in May 2008.  Pl. Dep. (Ex. B) at 18;

Pl.'s Adm. (Ex. A) No. 3.  He thus had until August 2009, fifteen months from completion of the

basic sciences program, to pass the USMLE Step 1 exam. Guidelines for Academic Probation

and Dismissal (Ex. C); Pl. Dep. (Ex. B) at 20.  Plaintiff failed the Step 1 exam on his first

attempt, on July 30, 2008.  Pl.'s Adm. (Ex. A) Nos. 13, 14.  After preparing for nearly a full year

to take it again, he failed on his second attempt on May 6, 2009.  *Id.* Nos. 15, 16.  On his third

and final attempt, and just as he was about to run out of time, Plaintiff finally passed the Step 1

exam on August 31, 2009, with a low – albeit passing – score.  Pl. Dep. (Ex. B) at 20; Pl.'s Adm.

(Ex. A) Nos. 13-16, 27, 28.

Plaintiff began his clinical rotations in December 2009.  Pl.'s Adm. (Ex. A) No. 31; Pl.

Dep. (Ex. B) at 20.  He completed them on October 14, 2011.  Pl.'s Adm. (Ex. A) No. 46; Pl.

Dep. (Ex. B) at 20.

 Plaintiff first attempted the Step 2 CS exam on April 13, 2011, before he completed his

clinical rotations, and failed that first attempt.  Pl.'s Adm. (Ex. A) Nos. 41, 42; Tilleman Dep.

(attached as Ex. K) at 65-66, 79; Pl. Dep. (Ex. B) at 78.  He ultimately passed the Step 2 CS

exam on his second attempt, on February 23, 2012.  Pl.'s Adm. (Ex. A) Nos. 56, 57; Tilleman

Dep. (Ex. K) at 65-66, 79; Pl. Dep. (Ex. B) at 27.

**D.      Plaintiff Fails Step 2 CK and Never is Ready to Re-take it**

Plaintiff failed his first and only attempt at the Step 2 CK exam on September 20, 2011, shortly before he completed his clinical rotations.  Pl.'s Adm. (Ex. A) Nos. 44, 45; Pl. Dep. (Ex. B) at 79.  He not only failed, but failed with a score that he acknowledged was "very low."  Pl.'s Adm. (Ex. A) No. 49.

As part of his preparation to re-take the Step 2 CK exam, Plaintiff took several "self-assessments" issued by the NBME – the organization that administers the USMLE exams.  *Id.* Nos. 58, 59.  The NBME self-assessment uses questions from prior USMLE exams.  Pl. Dep. (Ex. B) at 29, 66, 78; Pl.'s Adm. (Ex. A) No. 59.  Not surprisingly, studies have shown a correlation between performance on the NBME self-assessment and performance on the USMLE exam.  Tilleman Dep. (attached as Ex. K) at 54-55

From October 2012 (already twelve months after completing his clinical rotations) to May 2013, Plaintiff completed three NBME self-assessments.  *Id.* at 79, 82.  He received very low failing scores on all three:  just 135, 137, and 140 points, respectively, out of a possible 800.  *Id.* at 82, 83.  Plaintiff admits that these were not close to passing scores.  *Id.* at 83.

On May 16, 2013, Plaintiff took his fourth NBME self-assessment.  Tilleman Dep. (Ex. K) at 21.  Rather than showing improvement, and even though he had been studying for a year and a half since the completion of his clinical rotations, he did even worse than before:  He scored just 80 points out of a possible 800 – far below what would equate to a passing score on the Step 2 CK exam itself, and well below the failing scores he had received on the three previous NBME self-assessments.  Pl.'s Adm. (Ex. A) No. 62; Tilleman Dep. (Ex. K) at 22.  That same day, Plaintiff sent an email to the new Clinical Dean, Dr. Tamara Tilleman, reporting

the results of the self-assessment and conceding that his Step 2 exam preparation "strategy" was "not working."  Pl.'s Adm. (Ex. A) No. 64.

Plaintiff by this point was well aware that he was beyond the twelve-month deadline for passing the Step 2 examinations and that he was running on borrowed time to demonstrate his readiness to take the exam again.  Pl. Dep. (Ex. B) at 96.  Plaintiff previously had sought an extension of the twelve-month deadline, notifying MUA staff that sudden deaths in his family and other personal issues in 2012 and 2013 had distracted him from his studies.  Pl. Dep. (Ex. B) at 86-87.

It is undisputed that at no time did Dr. Tilleman or anyone else at MUA tell Plaintiff that MUA had waived the policy that students who have not passed the exams within twelve months of completing their clinical rotations are subject to dismissal.  Although MUA applies that policy with some leniency – endeavoring to work with students who approach or pass the deadline – that flexibility does not extend indefinitely, especially where the student is showing no progress toward passing the Step 2 exam.  Green Dep. (Ex. G) at 13, 16.

On July 22, 2013, Dean Tilleman sent an email to Plaintiff informing him that he needed to submit an approved study plan before MUA would decide whether to certify him to attempt the Step 2 CK exam a second time.  Pl.'s Adm. (Ex. A) No. 65.  After his first study plan was rejected, Plaintiff submitted a revised study plan on August 8, 2013, which was approved.  *Id.* No. 66.  The study plan required Plaintiff to take three more NBME self-assessments and submit the scores to Dean Tilleman.  Academic Study Plan (Pl. Dep. Ex. 13) (attached as Ex. L); Tilleman Dep. (Ex. K) at 50.  Plaintiff understood that Dean Tilleman would be using the scores to determine if and when he was ready to take the Step 2 CK exam a second time.  Pl. Dep. (Ex. B) at 62-63; Tilleman Dep. (Ex. K) at 50-51.

On August 17, 2013, Plaintiff emailed to Dean Tilleman the results of another NBME self-assessment, which he had taken the previous day.  Pl.'s Adm. (Ex. A) No. 67; Aug. 17, 2013 Email (attached as Ex. M).  This time, he scored just 130 points out of a possible 800 – again well below what would correlate to a passing score on the Step 2 CK exam.  Pl.'s Adm. (Ex. A) Nos. 68, 69.  Thus, after taking five NBME self-assessments over the course of the preceding year, Plaintiff had failed to achieve anything close to a passing score and had not demonstrated any improvement in his readiness to pass the Step 2 CK exam.  Pl. Dep. (Ex. B) at 83; Tilleman Dep. (Ex. K) at 51, 63, 64.

> **E.    Upon Learning of His Impending Dismissal from MUA, Plaintiff Immediately Submits Two Unreliable Self-Assessment Scores**

Because Plaintiff by this point was well beyond the twelve-month deadline for passing both Step 2 exams and was not demonstrating any improvement in his readiness to re-take the Step 2 CK exam, Dean Tilleman informed Plaintiff on or about September 26, 2013 that a committee of the school's management had met and decided he would no longer be considered enrolled in the M.D. program.  Pl.'s Adm. (Ex. A) Nos. 74, 76; Tilleman Dep. (Ex. K) at 43, 50-51, 63, 64.

In a last-ditch attempt to avoid dismissal, Plaintiff quickly took and reported to Dean Tilleman the results of two more self-assessment exams – hoping that she would certify him to re-take the Step 2 CK exam:  First, On October 2, 2013, Plaintiff took one of the NBME self-assessment exams he had taken previously, which resulted in a score of 580 out of 800 – a dramatic difference from his prior results.  Pl.'s Adm. (Ex. A) Nos. 80, 81, 82.  In an email to Dean Tilleman the same day, Plaintiff conceded that he was "not sure what to think about this score."  *Id.* No. 83.  He admitted that he "had taken this version of the exam in 2012" and that "the questions seemed familiar" to him.  *Id.*  Dr. Tilleman responded the next day, agreeing that

the test result was compromised on this basis alone.  *Id.* Nos. 84, 85.  She also was unable to

determine if Plaintiff had taken the exam "open book" or had taken it un-timed, either of which

would have further compromised the score.  Tilleman Dep. (Ex. K) at 46.

Second, on October 7, 2013, Plaintiff emailed to Dean Tilleman the results of a

completely different practice test issued by "USMLE World" – not an NBME self-assessment, as

required by his study plan.  Pl.'s Adm. (Ex. A) No. 86; Tilleman Dep. (Ex. K) at 55-56.  This

practice test resulted in a score of 438 out of 800.  Pl.'s Adm. (Ex. A) Nos. 87, 88.  In reporting

the score to Dean Tilleman, Plaintiff conceded that "the length of the [USMLE World] questions

was a bit shorter than the real exam and [that the] questions were also a little less difficult than

those of the NBME [self-assessment]."  *Id.* No. 90.  Dean Tilleman does not consider the

USMLE World to be reliable because, unlike NBME self-assessments, there is no published

correlation between USMLE World tests and success on the actual USMLE exam.  Tilleman

Dep. (Ex. K) at 54-55.

### F.    Plaintiff is Dismissed from MUA and Enrolls at Another School

On October 17, 2013, Plaintiff received a letter from the MUA Executive Dean, Dr.

Gordon Green, informing him that he would be withdrawn from MUA because he failed to pass

both Step 2 exams within three attempts and within twelve months of completing his clinical

rotations.   Oct. 17, 2013 Letter (Green Dep. Ex. 18) (attached as Ex. N).  Plaintiff appealed the

decision to withdraw him, CA 234, but it was upheld.  Nov. 21, 2013 Letter (Green. Dep. Ex. 19)

(attached as Ex. O).

Following his dismissal, Plaintiff transferred to another medical school in February 2014.

Pl. Dep. (Ex. B) at 22.  Although that school also requires students to pass the Step 2 exams to

graduate, Plaintiff still has not scheduled to re-take the Step 2 CK exam.  *Id*. at 27, 29-32.

ARGUMENT

## I.     JUDICIAL REVIEW OF CONTRACT CLAIMS ARISING FROM ACADEMIC DISMISSALS IS EXTREMELY LIMITED

Where, as here, a student claims that his university breached its contractual obligations to him in the context of an academic dismissal, the Court's review is guided by two well-established principles.  First, the Court interprets the contractual terms between university and student, including those found in a student handbook or other university policies, "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them."  *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998)); *Schaer v. Brandeis Univ.*, 432 Mass. 474, 478, 735 N.E.2d 373, 378 (2000) (same).

Second, a university's judgment on academic matters, including whether a student should be dismissed for failing to meet academic standards, is not subject to judicial review unless the university's decision was arbitrary and capricious.  *See, e.g., Cloud v. Trustees of Boston Univ.*, 720 F.2d 721, 725 (1st Cir. 1983); *Berkowitz v. President & Fellows of Harvard Coll.*, 58 Mass. App. Ct. 262, 269-70, 789 N.E.2d 575, 580-81 (2003).  Judicial deference to university decision-making is greatest where, as here, the university's decision involves a matter of academic judgment, as distinct from one involving student misconduct.  *See Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision … they should show great respect for the faculty's professional judgment [and] they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."); *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90, 92 (1978) (noting that courts "are particularly ill-equipped to evaluate academic

- 10 -

performance" and that an academic decision is "by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision"); *see also Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 25-26 (1st Cir. 1991) (following *Ewing* in connection with a medical school's application of its academic requirements to a disabled student); *Shocrylas v. Worcester State Coll.*, No. 06-40278-FDS, 2009 WL 3298126, at *7 (D. Mass. Aug. 7, 2009) (refusing to review a graduate school's grading decisions where there was no evidence of a "substantial departure from accepted academic norms") (citing *Ewing*, 474 U.S. at 225; *Horowitz*, 435 U.S. at 92); *el Kouni v. Trustees of Boston Univ.*, 169 F. Supp. 2d 1, 4 (D. Mass. 2001) (declining to expunge the record of a medical student dismissed for academic and conduct reasons).

Applying these well-established principles, Plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing all fail as a matter of law.

## II.    THE POLICY AT ISSUE WAS "IN WRITING" AND PLAINTIFF WAS WELL AWARE OF IT.

Plaintiff alleges in his Complaint and in the parties' Rule 16 Statement that the requirement which resulted in his dismissal from MUA was not a "written policy." Verified Compl. (attached as Ex. P) ¶ 16; Joint Statement Pursuant to Fed. R. Civ. P. 16(f) and L.R. 16.1 ("Joint Statement") (attached as Ex. Q) at 5. As discussed above, the facts adduced in discovery are to the contrary: MUA published the policy in a memorandum which it emailed to students and posted on the website that students regularly visit for information about school-related matters. Moreover, admits that he was specifically aware of the policy by at least 2011 – long before he ultimately was dismissed in late 2013 for failing to meet its requirements.

It also is well established, and Plaintiff does not contest, that a university has the authority to change its academic requirements, including its graduation requirements, at any

time, including during a student's enrollment.  *Coveney v. President & Trustees of Coll. of Holy Cross*, 388 Mass. 16, 22, 445 N.E.2d 136, 140 (1983) ("A college is 'clearly entitled to modify [its rules and regulations] so as to properly exercise its educational responsibility.'") (citing *Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976)); *see also*, *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988) ("implicit in the university's general 'contract' with its students is a right to change the university's academic degree requirements if such changes are not arbitrary or capricious"); *Hammond v. Auburn Univ.*, 669 F. Supp. 1555, 1560 (M.D. Ala. 1987), *aff'd*, 858 F.2d 744 (11th Cir. 1988) (changing graduation requirements after plaintiff enrolled was a reasonable exercise of a university's educational responsibilities).

Moreover, a university's policies – including changes in those policies – are effective regardless of whether they are published in the student handbook or in some other form.  *See Mangla,* 135 F.3d at 83 (the student-university contract "may include statements provided in student manuals and registration materials") (citing *Lyons v. Salve Regina Coll.*, 565 F.2d 200, 202 (1st Cir. 1977)); *Govan v. Trustees of Boston Univ.*, 66 F. Supp. 2d 74, 83 (D. Mass. 1999) ("Courts rely on 'catalogs, manuals, handbooks, etc.' to assist in the determination of the terms of contract with an academic institution.") (citing *Russell v. Salve Regina Coll.*, 890 F.2d 484, 489 (1st Cir. 1989), *rev'd on other grounds*, 499 U.S. 225 (1991), *reinstated on remand*, 938 F.2d 315, 316 (1st Cir. 1991)).

## III.   MUA DID NOT WAIVE THE STEP 2 REQUIREMENT BY GIVING PLAINTIFF EXTRA TIME IN WHICH TO TRY TO MEET IT.

Plaintiff claims that MUA waived its policy regarding passage of the Step 2 exams in his case when, instead of dismissing him immediately when he had failed to pass both exams within twelve months of completing his clinical rotations, MUA gave him extra time and entered into a

study plan that was intended to help prepare him to re-take the exam.  Ver. Compl. (Ex. P) ¶ 17;
Joint Statement (Ex. Q) at 5.  This argument also is without merit.

      The policy at issue provides that students must pass both Step 2 exams in order to
graduate, and that they must do so within twelve months of completing their clinical rotations or
be subject to dismissal – not that they will be dismissed immediately upon expiration of the
twelve-month period.  Plaintiff remained subject to dismissal at all times once he failed to pass
the Step 2 exams within the twelve-month period.  Thus, nothing about giving Plaintiff extra
time in which to re-take the exam, or giving him help in preparing to re-take the exam, is
contrary to the policy – much less a waiver of it.  *Cf. Onawola v. Johns Hopkins Univ.*, 412 F.
Supp. 2d 529, 533 (D. Md. 2006), *aff'd*, 221 F. App'x 211 (4th Cir. 2007) (where a university
granted numerous extensions of time and otherwise sought to assist the plaintiff before
ultimately dismissing him, no implied contract could be deemed to waive the university's
academic standards).

      At most, by granting Plaintiff some additional time in which to meet the Step 2
requirement and providing him the study plan, MUA implicitly committed to give Plaintiff some
reasonable amount of time in which to meet the requirement.  *MacDonald & Payne Co. v.
Metallic Arts of New England*, 324 Mass. 353, 357, 86 N.E.2d 516, 518 (1949) (grant of
extension of time to perform "would not mean that the time when the contract was to be
completed was without limits; it would still have to be performed within a reasonable time").
How much time would be reasonable would depend upon "the nature of the contract, the
probable intention of the parties as indicated by it, and the attendant circumstances."
*Charles River Park, Inc. v. Boston Redevelopment Auth.*, 28 Mass. App. Ct. 795, 814, 557
N.E.2d 20, 32 (1990).

In light of the fact that MUA gave Plaintiff eleven extra months in which to demonstrate his readiness to re-take the exam, and the fact that Plaintiff failed to demonstrate any progress throughout that time, Plaintiff could not reasonably expect that MUA was obligated to give him still more time before it ultimately determined to dismiss him.  Moreover, as noted above, Plaintiff still has not scheduled to re-take the Step 2 CK exam at his new medical school.  Thus, the undisputed facts demonstrate that even if MUA had given Plaintiff another full year or more, he still would not have been ready to re-take the exam.

## IV.     MUA'S DECISIONS WERE NOT ARBITRARY AND CAPRICIOUS.

Plaintiff contends that MUA acted arbitrarily and capriciously by declining to certify him to re-take the Step 2 CK examination and instead dismissing him from the M.D. program.  Ver. Compl. (Ex. P) ¶¶ 16-19, 23.  This argument also is without merit.

As noted above, a university's decision on a matter of academic judgment is not arbitrary and capricious, and thus not subject to judicial review, if there are any "reasonable grounds" to support it.  *E.g., Cloud,* 720 F.2d at 725.  MUA's decisions easily pass that test.  MUA dismissed Plaintiff only after he was well past the twelve-month deadline for passing both Step 2 exams, and thus had an inordinate amount of time to prepare for them.  After failing the Step 2 CK exam the first time by a wide margin, Plaintiff went on to take five NBME self-assessment exams – each time earning a score that was fall short of passing and failing to demonstrate any progress along the way.  Upon learning that he was on the verge of formal dismissal from the program, Plaintiff quickly submitted two self-assessment scores that purported to demonstrate his readiness to re-take the exam – but those scores were not reliable, as Plaintiff himself conceded at the time.  Moreover, if in fact Plaintiff were ready to re-take the exam, he would have done so by now through the new medical school at which he enrolled after his dismissal from MUA.  The

fact that Plaintiff has not re-taken the exam confirms that MUA's judgment – far from being arbitrary and capricious – was entirely correct.

CONCLUSION

R3's Motion for Summary Judgment should be allowed.

R3 EDUCATION, INC.,

/s/ Katherine A. Guarino
Daryl J. Lapp (BBO #554980)
    daryl.lapp@lockelord.com
Katherine A. Guarino (BBO #681848)
    katherine.guarino@lockelord.com
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA 02199

August 31, 2015                                    (617) 239-0100

**CERTIFICATE OF SERVICE**

On August 31, 2015, I caused to be filed electronically a true copy of the foregoing document using the CM/ECF system which effected service of the same upon all counsel of record.

/s/ Katherine A. Guarino
Katherine A. Guarino

AM 54276856.2